J-S31011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHAHID ABNEY | : | |
| | : | |
| Appellant | : | No. 291 EDA 2017 |

Appeal from the Judgment of Sentence December 9, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0012195-2015

BEFORE: SHOGAN, J., LAZARUS, J., and DUBOW, J.

MEMORANDUM BY SHOGAN, J.: **FILED AUGUST 09, 2018**

Appellant, Shahid Abney, appeals from the judgment of sentence entered on December 9, 2016, in the Philadelphia County Court of Common Pleas. We affirm.

In its opinion, the trial court set forth the underlying facts of this case as follows:

> The Complainant in this case is 21-year-old Tyree Clark ("[the] Complainant"), who was burglarized, robbed, and assaulted inside his home at 3017 Euclid Avenue, Philadelphia, Pennsylvania. The Complainant testified that in 2014 he moved to Philadelphia from Altoona, Pennsylvania, to be with his girlfriend ("Kaytlin") who was pregnant with his son. The Complainant originally lived in the city's Germantown section with his girlfriend and her mother, but he then moved to North Philadelphia and lived at 3017 Euclid Avenue. The Complainant's girlfriend and son alternately lived in Germantown and at 3017 Euclid Avenue, and were staying in Germantown when the crimes described below transpired. (N.T., 9/21/16, pgs. 23-25).

As well as working full-time in a warehouse, the Complainant endeavored to sell music "instrumentals" and involve himself in the music business. While marketing his instrumentals, the Complainant became acquainted with Appellant and [Appellant's co-defendant, Vernon] Womack, whom he knew respectively as "Heed" and "Vern." Appellant and Womack lived in the same neighborhood as the Complainant and fashioned themselves as aspiring rappers. During the month or two preceding the robbery, the Complainant saw Appellant almost every day hanging around the neighborhood of 31st and Berks Streets, and on weekends he saw Womack hanging around Appellant in the same area. (N.T., 9/21/16, pgs. 25-28).

On October 13, 2015, Appellant, Womack, and a male named Juan went to the Complainant's home to discuss "making music" with the Complainant's instrumentals. The two-story rowhome had three bedrooms and the men discussed music in the Complainant's room, which contained a laptop, television, speakers and other "music-making" equipment. (N.T., 9/21/16, pgs. 28-30).

The next day, on October 14, 2015, the Complainant worked at his regular warehouse job and then went home. Around 11:50 p.m. that evening, the Complainant received a phone call from a number he did not recognize. The caller identified himself as "Vern" and said he was with "Heed" and "wanted to come over and make music." The Complainant expressed reluctance because it was late and he was working the next day, but he ultimately said "okay" after Vern assured they would not stay long and would finish with the instrumentals by 12:30 a.m. (N.T., 9/21/16, pg. 30-31).

Vern - *i.e.* Womack - called again a few minutes later and said he was standing across the street from the Complainant's home. After looking out his bedroom window but not seeing anyone, the Complainant walked downstairs, opened his front door, and encountered Appellant and Womack standing on his front porch wearing coats. Upon entering the Complainant's home, both Appellant and Womack pulled out "black semi-automatic" guns from their coats and pointed them pointblank at the Complainant's head. (N.T., 9/21/16, pgs. 31-34).

Appellant and Womack ordered the Complainant upstairs to his bedroom, demanded certain of his possessions, and

threatened to kill the Complainant if he lied about the whereabouts of any items. Once inside the bedroom, Appellant retrieved a belt from a closet and tied the Complainant's hands behind his back. Appellant then pulled down the Complainant's pants and removed his wallet and cellphone from his pockets. Womack meanwhile struck the Complainant's nose with the butt of his gun, causing a nosebleed. The Complainant begged Womack not to kill him because he has a son, but Womack replied that he [did not] give a fuck about the Complainant's son. (N.T., 9/21/16, pgs. 34-36).

Appellant and Womack placed a black sweater over the Complainant's face so he couldn't see anything or breathe. Because the Complainant still bled from his nose, he was swallowing his own blood that continued running down his face beneath the sweater. Appellant and Womack then split apart the two box springs composing the Complainant's kingsized bed and ordered the Complainant to lay down between them. The men threw the bed mattress and a dresser on top of the Complainant, further restricting not only his movement but his ability to breathe. (N.T., 9/21/16, pgs. 36-38).

For the next half hour, Appellant and Womack rummaged through both floors of the Complainant's home, threatening to kill him all the while. At one point Appellant and Womack pressed their guns to the Complainant's stomach and demanded the password for his [iP]hone. Appellant and Womack also used their own cellphones to photograph the Complainant's identification and social security card, and threatened to harm the Complainant's girlfriend and son if he informed the police. (N.T., 9/21/16, pgs. 38-39).

When they finished ransacking the home, Appellant and Womack took all the money from the Complainant's wallet except $20, removed the Complainant from between the box springs, told him to count 60 seconds while they left the premises, and ordered him to then leave Philadelphia immediately. Pointing their guns at the Complainant, Appellant and Womack threatened to kill him if they ever saw him again. (N.T., 9/21/16, pgs. 39-41).

After the intruders departed, the Complainant hastily attempted to gather some of his remaining possessions, but "everything was ruined ..., ripped up and just out of place." Carrying only a toothbrush and toothpaste, the Complainant left

his home and went to a nearby Chinese store for help, but the woman working inside the store "laughed" and "wouldn't help" him. The Complainant therefore walked to a shopping center around five (5) blocks from his home, and a passerby allowed the Complainant to use his phone. The Complainant first called his girlfriend, who did not answer, and he then called a taxi for a ride to where his girlfriend was staying in Germantown. (N.T., 9/21/16, pgs. 45-49).

The Complainant arrived at the Germantown home around 2:00 a.m. and told his girlfriend about the incident. The Complainant's girlfriend called an ambulance and accompanied the Complainant to Roxborough Hospital, where a doctor called 911. A police officer arrived around 3:00 a.m. and transported the Complainant and his girlfriend to Central Detectives, where he gave a statement to Detective Neil Goldstein. At the time, the Complainant was unaware of the home invaders' last names, so he identified them by viewing Instagram photographs from the accounts of mutual friends. (N.T., 9/21/16, pgs. 49-58).

After receiving the Complainant's statement, detectives escorted him to Euclid Avenue to search for Appellant and Womack, but neither suspect was located and the Complainant eventually was driven to his girlfriend's home in Germantown. The following day, on October 16, 2015, the Complainant requested a police escort back to his home so he could retrieve some belongings. He feared returning alone because Appellant and Womack threatened to kill him if they saw him again. Three officers in two police vehicles provided the escort, and while in route the officers suggested that they survey the area for Appellant and Womack. This time the Complainant identified Appellant standing on the corner of 31st and Berks Streets with several other males, and the officers immediately arrested him. (N.T., 9/21/16, pgs. 59-63).

On November 24, 2015, the Complainant testified before the grand jury in this matter, and on the same day he identified Womack in a photo array that Detective Goldstein prepared. In early December 2015, after testifying before the grand jury, the Complainant was contacted on Instagram by Womack. During the Instagram conversation, which the Commonwealth presented at trial in redacted form, Womack wrote:

"Aye ... if u over it then don't show up to that shit bro, it ain't that deep, how u gonna be this 'tuff' rapper but you telling that don't add up bro"

"hopefully we can move past dat shit 1 day but at the end of the day are u gnna stop ya 'babymom' from showing up to court"

"Answer this for me, u say u ain't worry bout that so are you gram stop ya bm from going is Wat I'm saying? I kno man I fucks wit u, that's Sumin that should of never happen bruh"

"I kno u ain't my 'bro' but I still fucks wit u, I kno where u at wit it, if I ain't fucks with us ... I woulda came holla at u but I ain't on that type time, I got respect for u at the end of the day"

"Exactly man I kno you got a son that u love, I'm bouta have a baby nd shit, I'm just focus on music nd working for my family wish dat shit never happen, like I said tho wish that shit never happen hopefully we can make music 1 day, nd i will get u brand new shit better than that old shit word. Wym u ain't get something about going to court."

(N.T., 9/21/16, pgs. 64-74 and Commonwealth Exhibit "C-44").

The Commonwealth also played the recordings of two prison phone calls that Appellant made to an unidentified woman shortly after his arrest. The transcript of the first conversation, which occurred on October 19, 2015, states:

Woman. "Whatchu was thinking bout?"

Appellant. "How I'm gonna get out of this situation."

Woman. "I think there only one way."

Appellant. "What you say?"

Woman. "I said I think there's only one way."

Appellant. "Exactly."

Woman.   "To have him come up there and say he misidentified."

Appellant.   "Yeah."

The transcript of the second conversation, which occurred on October 21, 2015, states in relevant part:

Woman.   "Yeah so what they said you went in his house and took his stuff?"

Appellant.   "Yeah."

Woman.   "Tied him up and everything."

Appellant.   "Yeah."

Woman.   "And the gun. ... You had a gun and all that?"

Appellant.   "Yeah, He said I, what's his name. Pistol whipped him and all that. Its crazy man, but he's saying it's a grand jury jawn. 22 umm..."

…

Woman.   "Alright so. Whatever. What I'm saying, … the guy ain't coming or something like that."

Appellant.   "Huh?"

Woman.   "The guy was supposed to come. I say it's best for the guy to come and say he identified the wrong person."

Appellant.   "Yeah."

(N.T., 9/22/16, pgs. 29-31 and Commonwealth Exhibit "C-42").

Trial Court Opinion, 5/15/17, at 2-8 (internal footnotes and some quotation marks omitted).[1]

Following a trial, on September 20, 2016, the jury found Appellant guilty of robbery, conspiracy to commit robbery, burglary, carrying a firearm without a license, carrying a firearm in public in Philadelphia, theft by unlawful taking, possessing an instrument of a crime, and terroristic threats.[2]  After the jury reached its verdict, the trial court held a separate bench trial on the charge of possession of a firearm by a prohibited person in violation of 18 Pa.C.S. § 6105(a)(1), and the trial court found Appellant guilty.

On December 9, 2016, the trial court sentenced Appellant to serve a term of ten to twenty years of incarceration for robbery, followed by one to two years of consecutive incarceration for burglary.  The trial court also sentenced Appellant to serve two to four years of incarceration for possession of a firearm by a prohibited person, and the trial court ordered Appellant to serve this sentence concurrently with the sentence for robbery.  The trial court imposed no further sentences on Appellant's remaining convictions resulting in an aggregate sentence of eleven to twenty-two years of confinement.

---

[1] Appellant's co-defendant, Vernon Womack, also filed an appeal.  That appeal is docketed at 298 EDA 2017.

[2] 18 Pa.C.S. §§ 3701(a)(1)(ii), 903, 3502(a)(1)(i), 6106, 6108, 3921(a), 907(a), and 2706(a)(1), respectively.

On December 16, 2016, Appellant filed a timely post-sentence motion that the trial court denied on December 19, 2016. Appellant filed a timely appeal on January 13, 2017. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant raises the following issues for this Court's consideration:

1. Was the verdict against the weight of the evidence?

2. Did the court err in not granting the defense motion for a mistrial when the following occurred at trial:

> (i) the court partially stated the consciousness of guilt jury instruction with respect to the prison telephone calls after the court had already ruled that it would not give such a charge, and such a charge vitiated the effects of the Bruton redaction, and
>
> (ii) a paralegal from the District Attorney's Office prejudicially testified as to her interpretations of Instagram messages purportedly made by [Appellant's] Co-Defendant Vernon Womack?

Appellant's Brief at 2-3.

In Appellant's first issue, he alleges that the verdict was against the weight of the evidence. Our standard of review is as follows:

> When considering challenges to the weight of the evidence, we apply the following precepts. The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses. Resolving contradictory testimony and questions of credibility are matters for the finder of fact. It is well-settled that we cannot substitute our judgment for that of the trier of fact.
>
> Moreover, Appellate review of a weight claim is a review of the exercise of discretion, not the underlying question of whether

- 8 -

the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is or is not against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

Furthermore, in order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed. For that reason, the trial court need not view the evidence in the light most favorable to the verdict winner, and may instead use its discretion in concluding whether the verdict was against the weight of the evidence.

***Commonwealth v. Miller***, 172 A.3d 632, 642-643 (Pa. Super. 2017) (internal citations and quotation marks omitted).

Here, Appellant's argument merely assails the credibility of the Complainant. Appellant's Brief at 10-11. Essentially, Appellant is requesting this Court to reweigh the Complainant's testimony; we decline Appellant's request. This Court's responsibility is to review the trial court's exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence. ***Miller***, 172 A.3d at 643. As stated above, the fact finder was free to believe all, part, or none of the evidence and to determine the credibility of the witness. ***Id.*** at 642. Our review of the record reveals that the evidence was not vague or uncertain, and the verdict was not so

- 9 -

contrary to the evidence as to shock the conscience. The Complainant gave a detailed recitation of the events leading to Appellant's arrest and convictions, N.T., 9/21/16, at 40-86, and any inconsistencies were properly resolved by the jury. *Miller*, 172 A.3d at 642. We conclude the trial court properly exercised its discretion in concluding that the jury's verdict was not against the weight of the evidence. Accordingly, Appellant is entitled to no relief.

Next, Appellant avers that the trial court erred in denying his motion for a mistrial on two grounds: 1)Appellant argues that a mistrial should have been granted when the trial court partially stated the consciousness-of-guilt jury instruction concerning prison telephone calls after the trial court ruled that it would not give such a charge; and 2) Appellant argues that a mistrial should have been granted when a paralegal from the District Attorney's Office prejudicially testified as to her interpretations of Instagram messages purportedly made by Appellant's co-defendant Vernon Womack. We will address these claims of error in turn.

Our standard of review of a trial court's denial of a motion for a mistrial is as follows:

> A motion for a mistrial is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. On appeal, our standard of review is whether the trial court abused that discretion.

- 10 -

*Commonwealth v. Caldwell*, 117 A.3d 763, 774 (Pa. Super. 2015) (citations omitted).

Appellant first alleges that the trial court erred in "not granting the defense motion for a mistrial when the … court partially stated the consciousness of guilt jury instruction with respect to the prison telephone calls after the court had already ruled that it would not give such a charge[.]" Appellant's Brief at 2-3. After review, we agree with the Commonwealth that Appellant failed to preserve this issue on appeal for two reasons. Commonwealth's Brief at 14. First, it is clear from the record that Appellant failed to request a mistrial on this basis;[3] therefore, the issue is waived. *See Commonwealth v. Poplawski*, 130 A.3d 697, 729 (Pa. 2015) (holding that in the absence of a contemporaneous and specific objection at trial, the issue is waived). Second, Appellant failed to include this issue in his Pa.R.A.P. 1925(b) statement; accordingly, this issue is waived on that basis as well. *See Commonwealth v. Castillo*, 888 A.2d 775, 780 (Pa. 2005) ("Any issues not raised in a Pa.R.A.P. 1925(b) statement will be waived.").

Appellant next argues that the trial court should have granted a mistrial after a paralegal from the District Attorney's Office testified regarding images

---

[3] The record reflects that counsel asked to see the trial court at side bar and a curative instruction was given; however, there is no indication that a mistrial was requested or denied. N.T., 9/22/16, at 118.

from Appellant's social media accounts. The trial court addressed this issue

as follows:

> A mistrial is an extreme remedy that must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial. Commonwealth v. Bracey, 831 A.2d 678, 682 (Pa. Super. 2003) (citations omitted here). A trial court may remove taint caused by improper testimony through curative instructions. Id. Courts must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required. Id.

> The Commonwealth presented the testimony of Maria Cerino ("Ms. Cerino"), who is a paralegal at the Philadelphia District Attorney's Office. At the district attorney's request, Ms. Cerino searched social media accounts for information and photographs concerning Appellant and Womack, and gathered these materials into a packet for the district attorney. While testifying, Ms. Cerino identified photographs from Appellant's Facebook page and Instagram profile. (N.T., 9/22/16, pgs. 19-27). When asked to identify a photograph in the packet, Ms. Cerino testified: "This is a photo from Appellant's Instagram again, and he is standing on the step pointing his fingers in a gun motion." (Id. at pg. 25). Trial counsel immediately objected to Ms. Cerino's testimony, and this Court sustained the objection, directing the jury to disregard Ms. Cerino's interpretation of the photograph. This Court instructed:

> > Ladies and Gentlemen of the Jury, you are not to accept Ms. Cerino's interpretation of that last photograph. You are viewing the photograph with your own eyes. It's up to you to interpret that photograph. It's not up to Ms. Cerino. That answer was stricken from the record. I am instructing you must disregard it.

> (Id. at pgs. 25-26).

> Juries are presumed to follow the trial court's instructions, and a trial court's curative instruction is presumed to be sufficient to cure any prejudice to Appellant. [Commonwealth v.] Thornton, 791 A.2d 1190, 1192 [(Pa. Super. 2002)] (citations omitted here). Accordingly, this Court's curative instruction is presumed to be

> sufficient to cure any prejudice resulting from Ms. Cerino's testimony, and Appellant has not articulated any rebuttal to this presumption. Id. Given the collateral and cumulative nature of Ms. Cerino's testimony, together with this Court's curative instruction, a mistrial was wholly unwarranted and Appellant's appeal on this ground is frivolous.

Trial Court Opinion, 5/15/17, at 20-21 (internal brackets and some internal quotation marks omitted).

After review, we note that the trial court weighed the remarks made by the witness against any prejudice that may have resulted, and the trial court provided a curative instruction.  We discern no abuse of discretion in the trial court's conclusion that a mistrial was not warranted.  **Caldwell**, 117 A.3d at 774.

For the reasons set forth above, we conclude that no relief is due. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/9/18

- 13 -